Mark Allen WISEHART, Appellant,

v.

STATE of Indiana, Appellee.

No. 384S89.

Supreme Court of Indiana.

Oct. 31, 1985.

Rehearing Denied Jan. 20, 1986.

Garry W. Miracle, Anderson, for appellant.

Linley E. Pearson, Atty. Gen. of Ind., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendant-Appellant Mark Allen Wisehart was found guilty by a jury in the Madison Superior Court, Division III, of the crimes of murder, burglary, robbery and theft. The prosecuting attorney requested consideration of the death penalty on the murder charge. After finding Defendant guilty, the jury reconvened and returned a recommendation of death. On September 26, 1983, the trial court sentenced the defendant to death on the murder charge, said sentence to be carried out thirty (30) days after all appeals are exhausted.

Appellant Wisehart now directly appeals and raises thirteen (13) issues for our consideration as follows:

1. involuntariness of Defendant's confessions;

2. refusal by the trial judge to permit individual *voir dire* of prospective jurors;

3. improper questioning of jury during *voir dire;*

4. refusal of trial judge to permit defendant to hire a private sociologist at public expense;

5. improper exclusion of expert testimony;

6. improper exclusion of cross-examination questions to investigating officers;

7. alleged refusal of the State to reveal an agreement with one of the State's witnesses;

8. violation of separation of witnesses order;

9. improper exclusion of newspaper articles submitted by Defendant;

10. alleged improper argument by the State during final argument;

11. alleged improper exclusion of certain testimony in the penalty phase of the trial;

12. sufficiency of the evidence; and

13. constitutionality and propriety of the death sentence.

The facts tend to show that at 10:30 p.m. on October 9, 1982, Anderson, Indiana police officer Wasilewski entered Apartment 304 at 29th and Brown Streets. The police had received a phone call informing them they would find the body of a woman at that location. Officer Wasilewski, receiving this information by radio dispatch, found the body of Marjorie Johnson at said apartment. Her clothing was torn and wrapped around her mid-section and her head beaten and bloody. A bloody butter knife was lying near her body and numerous stab wounds appeared on her body. What appeared to be her billfold, with the contents removed and scattered was found on the bathroom floor.

Marjorie Johnson had been a regular visitor at the Christian Center where Mark Wisehart resided. The director of the Christian Center said that on the morning after the murder he noticed Mike Wisehart look at the papers, go straight to the article about Marjorie Johnson's murder, read it, and return the paper. Another resident of the Center, also named Johnson, said that earlier Wisehart had sent a letter to John-

son, talking about going to old people's houses and robbing them. The letter was put into evidence and it concluded by saying defendant Wisehart would be armed and would kill if anyone got in his way. Johnson testified that he talked to Wisehart after Marjorie Johnson's murder and Wisehart, aware Johnson would be a witness, said to him, "Try to make it look like I'm crazy." (Record at 1118).

On October 15, Officer Tracy and Detective Brown went to the Christian Center to pick up Mark Wisehart. He was cooperative and agreed to go to the police station. Once there, he executed a written waiver of rights and gave statements to the police confessing to this crime. In his statements to the police he admitted stabbing Marjorie Johnson several times with several weapons, striking her with his fist and hitting her about the head with a whisky bottle. He also stated he went through her purse and took fourteen ($14.00) dollars. He admitted it was he who had tipped off the police, disguising his voice in a high-pitched manner to sound like a woman. An autopsy performed by forensic pathologist John Pless indicated there were several severe blunt force injuries and fractures to Marjorie Johnson's head and thirteen stab wounds to her body. A photograph of her body shows cuts just at or below the left jawbone, stab wounds to the chest and one on the left shoulder. The fibroid cartilage commonly called the "Adam's apple" was fractured with hemorrhage and she also had broken ribs. The cause of death was determined to be multiple blunt force injury to the head and multiple stab wounds to the face and chest. The pathologist was not able to determine the time of death.

I

■ Appellant first claims the trial court erred in failing to grant his motion to suppress his confessions. His argument is based solely on the statement made by Detective Brown during the suppression hearing. At that hearing, Detective Brown stated: "I advised him by signing it [the waiver] he was not admitting or denying any guilt or giving up any rights." (Record at 505). Appellant contends this indicates he was fooled or tricked into thinking that signing of a rights waiver did not constitute the waiver of any rights and therefore was an improper solicitation of his confession. The record shows, however, that Appellant was fully advised of all of his *Miranda* rights prior to having given any confessions or statements to the police. The written advisements and waiver by the defendant show that all of the rights were given to him therein. Furthermore, in his taped confession, taken immediately thereafter, it is apparent Defendant was fully advised of all of his rights and he indicated he understood them. Detective Brown's statement did not purport to be a direct quotation of what he may have told Wisehart, but was only a paraphrase of the standard rights advisement, in particular stressing that Defendant could still terminate the interrogation and retain counsel. This is borne out by the beginning of the taped confession which is as follows:

"The date is Saturday. The date is Saturday, the 16th of October, 1982 at approximately 12:30 a.m. in the morning. Present are Detective Lloyd R. Brown, Anderson Police Department, Detective Randy Tracy, Anderson Police Department, and Mark Allen Wisehart, uh, a resident of the Christian Center here in Anderson.

"Q. Uh, Mark, you understand at this time you are under arrest for the murder and robbery of a Marjorie Johnson in the Brock Apartments; correct?

"A. (No audible answer)

"Q. Okay, do you understand that you have the right to remain silent?

"A. Yes.

"Q. Do you understand anything you say can be used against you in court?

"A. Yes.

"Q. Do you understand you have a right to consult with an attorney and have an attorney present?

"A. Yes.

"Q. And do you also understand if you cannot afford a lawyer one will be ap-

pointed for you before any questions if you so desire?

"A.   Mm hmm.

"Q.   Okay, do you also understand that if you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time?

"A.   Yes.

"Q.   And do you also understand you also have the right to stop answering at any time until you talk to a lawyer?

"A.   Yes.

"Q.   Okay, you've already given us . . . ."

(Record at 635–636)

There is therefore no showing that the confession was extracted by any sort of threats or violence nor obtained by any direct or implied promises nor by the exertion of any improper influence. *Rowe v. State,* (1983) Ind., 444 N.E.2d 303; *Hendricks v. State,* (1978) 267 Ind. 496, 371 N.E.2d 1312, *cert. denied* 436 U.S. 961, 98 S.Ct. 3079, 57 L.Ed.2d 1127. The trial court accordingly committed no reversible error in denying the motion to suppress.

## II

■  Appellant claims the trial court erred in denying his motion to individually *voir dire* each of the prospective jurors outside the presence of the others. This issue has already been decided by this Court adverse to Defendant's position in *Burris v. State,* (1984) Ind., 465 N.E.2d 171, *cert. denied,* — U.S. ——, 105 S.Ct. 816, 83 L.Ed.2d 809, and *Smith v. State,* (1984) Ind., 465 N.E.2d 1105, *reh. denied.* Defendant points out no particular or actual prejudice in his case that distinguishes it from *Smith* and *Burris.* No reversible error is therefore presented on this issue.

## III

■  The defendant asked this Court to rule that *voir dire* on the issue of the death penalty is not appropriate. He does not point to any particular questions asked of the jury in the instant case but generally claims that any *voir dire* referring to the death penalty is improper. *Voir dire* of a jury in a death penalty case has been approved by the United States Supreme Court, and the limitations set out on such voir dire, in *Witherspoon v. Illinois,* (1968) 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776. The United States Supreme Court spoke further on the subject in *Adams v. Texas,* (1980) 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 by deciding that the trial court may exclude a juror for cause if that juror is not willing to consider all of the penalties provided by State law and is irrevocably committed to vote against the death penalty prior to trial. This Court has exhaustively covered this subject adverse to Appellant's position, and followed *Witherspoon,* and *Adams. Smith, supra; Burris, supra; Hoskins v. State,* (1982) Ind., 441 N.E.2d 419; *Lamar v. State,* (1977) 266 Ind. 689, 366 N.E.2d 652, *reh. denied; Monserrate v. State,* (1971) 256 Ind. 623, 271 N.E.2d 420 (reversed and remanded based on *Witherspoon* ).

■  Appellant further claims the trial court erred by failing to permit the jury to be informed during *voir dire* of the possible terms of years for the charged offenses other than the death penalty. Again, the trial court acted properly. Inasmuch as the jury in a felony case has no sentencing function it should not be informed as to the range of sentences possible. In a death penalty case, the jury has a limited function to recommend whether or not capital punishment is appropriate in its opinion and after having found the defendant guilty of murder. The trial court therefore did not err in providing that the jury would not be advised and questioned concerning the terms of years to which Defendant could be sentenced were he to be found guilty of any of the crimes with which he was charged. *Burris, supra; State v. Williams,* (1982) Ind., 430 N.E.2d 756; *DeBose v. State,* (1979) 270 Ind. 675, 389 N.E.2d 272.

## IV

Prior to trial Defendant moved the court to authorize him to hire a psychiatrist, an

investigator, and a sociologist, at public expense, to aid him in preparing his defense. The trial court granted Defendant's motion to hire a psychiatrist and an investigator, at public expense, but denied the motion to hire a sociologist. It is now Appellant's contention that the trial court erred in refusing this request.

■ It is well settled that an accused is not constitutionally entitled at public expense to any type of expert the accused desires to support his case. This matter is commended to the sound discretion of the trial court whose determination will not be overturned absent a showing of abuse of discretion. *Thomas v. State*, (1984) Ind., 459 N.E.2d 373; *Craig v. State*, (1983) Ind., 452 N.E.2d 921. Defendant fails to explain why a sociologist was necessary to prepare his defense. He makes the general statement that one was needed and that it was refused and therefore error. There is neither a showing as to why the sociologist was needed, nor how Defendant was prejudiced by the judge's denial of Defendant's motion. We therefore find no abuse of discretion nor any error committed by the trial court in this regard.

### V

Appellant contends the trial court erred in sustaining objections by the State to questions put by the defense to certain expert witnesses.

Mary Bradshaw testified for Defendant. She testified she was a treatment-diagnostics specialist at Crossroads Fort Wayne Children's Home, with a Master's Degree in pre-clinical psychology from St. Francis College. She worked with residents in individual and group therapy and applied psychological, personality and intelligence testing. She had seen Defendant in that capacity.

Witness Bradshaw testified at length about her observations of Defendant. She described him as a suspicious, paranoid and very troubled young man with bizarre thinking and some fantasies. She detailed some of his fantasies, including one involving a "buddy" from a place in outer space

called "Nick's Plant." (Record at 1806–1807). She elaborated on his unusual behavior and termed him self-destructive. During the cross-examination she was asked to examine a diagnostic and statistical manual, which she commonly referred to in attempting to classify child patients. She was then asked under what category she would place Defendant. In other words, she was asked to tell the mental disease from which Defendant was suffering. She stated she could not technically diagnose. Consequently, the State objected to her answering the question on the grounds she was not qualified to diagnose due to her lack of training and her admission of not being qualified. The objection was sustained.

■ The trial court committed no error in sustaining this objection. It lies in the sound discretion of the trial court to determine the competence of a witness to deliver an expert opinion on a subject. The trial court's determination is reviewed on appeal only for an abuse of that discretion. *Hare v. State*, (1984) Ind., 467 N.E.2d 7; *Lawhorn v. State*, (1983) Ind., 452 N.E.2d 915. Anyone who has observed a defendant is competent to testify, giving an opinion as to the observable conduct of that defendant that would indicate whether the person acted normally or might demonstrate mental incapacity to be legally responsible for his or her criminal acts. A lay person is qualified to do this and Mary Bradshaw did so here. However, the question excluded by the court was not this question. Mary Bradshaw was asked to diagnose the specific mental disease from which Defendant was suffering. By her own admission she was not competent to do this by lack of formal education and training. The answer, therefore, was properly excluded.

A similar question arose during the testimony of Kenneth L. Joy, director of a psychology clinic at Ball State University, teacher, and private practitioner involving work on custody matters and forensic psychology. He described forensic psychology

as the application of psychology to the law. His credentials included a baccalaureate degree, a master's degree, and a doctorate. Further, he was doing post-doctoral work in law and was licensed by the Department of Public Instruction as a school psychologist. He testified that either a psychiatrist or a psychologist may render a diagnosis as to mental disease or defect. Further, he testified that he diagnosed defendant Wisehart as suffering from atypical psychosis involving a schizophrenic process, and detailed Defendant's symptoms.

During examination, the defense summarized the Indiana Statute giving the test to determine legal insanity and then asked Joy, "Would you say that someone who suffers from atypical psychosis or schizotypal personality would fit either of those standards?" (Record at 1878). The State objected to this question on the basis there was a lack of a showing of qualification of Dr. Joy as an expert regarding that question. The Court sustained this objection since Joy was not a psychiatrist.

█ The State's contention is the trial court properly excluded the answer to the question since it in effect asked if all persons having a particular mental disorder are therefore criminally and legally insane. The State contends that no expert can testify that the existence of a particular mental disorder *ipso facto* renders persons legally insane, citing *Taylor v. State*, (1982) Ind., 440 N.E.2d 1109. We fail to see reversible error in this ruling by the Court. Witness Joy was able to testify at length about his observations and diagnosis of the defendant. He was never asked, however, whether the mental disease or defect he actually diagnosed prevented Wisehart from understanding the difference between right and wrong or rendered Wisehart incapable of conforming his actions to the requirements of the law. This, of course, was the proper question to ask the witness and he would have been qualified to answer it. It cannot be said the trial court excluded this proper testimony by his ruling on the State's objection. The excluded question was not directed to the ultimate question of Wise-

hart's insanity defense and did not preclude the witness from testifying as to the ultimate question concerning Defendant's insanity due to his particular mental disorder. Therefore, there is no error presented on this issue.

## VI

The trial court excluded certain testimony by witness Kenneth Joy and investigating officer Moberly during the penalty phase of the trial. These questions related to involvement of other persons in this crime. The State maintains the offered testimony was speculative, merely repetitive and self-serving hearsay. Appellant has cited no authority whatever in his argument on this issue but since this is a capital case, we will not find waiver pursuant to Ind.R.App.P. 8.3(A)(7) but will review the propriety of the Court's rulings.

█ Officer Moberly was called by the defendant during the penalty phase to give his opinion as to whether Wisehart acted alone in the case. Officers Moberly and Brown had testified on this subject during the guilt phase of the trial and the court had granted the State's motion to incorporate all evidence of the guilt phase into the penalty phase. Officer Brown had testified during the guilt phase that he felt there was a possibility there were other people involved. Officer Moberly had testified that the defendant had told him he acted alone, but Moberly still felt there could have been someone present at Marjorie Johnson's door who left before the incident took place. Moberly said he had no evidence whatever to support this testimony. This Court held in *Smith v. State*, (1981) 420 N.E.2d 1225, it was proper to exclude the question and answer of a prosecutorial official's opinion as to whether that particular defendant was acting under the influence of another. Moberly had already testified he had no evidence to indicate anyone else was present during this incident but only thought it was possible someone else came to the door with the defendant. Since he already had testified to this before the jury in the guilt phase of the trial it is

difficult to discern any prejudice to the defendant by its exclusion during the penalty phase.

■ The defense also offered testimony of witness Joy that defendant Wisehart had told him two other persons were involved and Defendant stood by while those two other persons killed Mrs. Johnson. The trial court found that the repetition of this alleged statement of Defendant through witness Joy would be self-serving hearsay enabling Defendant to enhance his credibility by this impermissible method. *Marts v. State,* (1982) Ind., 432 N.E.2d 18, 24. There was no credible evidence of the involvement of any other person in this incident and Defendant had told no one else including the investigating officers that anyone had accompanied him. In view of all the evidence presented to the jury in this cause and all of the surrounding circumstances, we cannot say the trial court abused its discretion to the extent that reversible error is presented.

## VII

Defendant contends that the State connived in the presentation of testimony of witness Scott Johnson of perjured testimony wherein Johnson denied the existence of any agreement with the State regarding charges against Johnson himself in exchange for his testimony against Defendant in this cause. Johnson was a former friend of Wisehart and testified Wisehart had written many letters to Johnson speaking of his intention to rob old people and kill them if necessary. Wisehart had asked Johnson to testify in such a manner that it would help establish that Wisehart was insane.

Appellant does not present any evidence supporting the claim of an agreement or bargain with the State. He claims only that since there is some implication that Johnson himself was involved in a church burglary or break-in, that there is strong circumstantial evidence that an agreement must have existed. Therefore, the witness perjured himself in stating there was no such agreement and the State knowingly

allowed Johnson to do so. We find this to be a totally irresponsible charge presenting an issue totally lacking in merit.

No evidence in support of this claim is presented. We have only Defendant's supposition that it may or could be so. This presents no issue for review.

## VIII

■ Appellant claims it was a violation of the Separation of Witnesses Order to allow Officer Moberly to sit at the State's counsel table during trial and allow him to testify over Defendant's objection. Pursuant to the Separation of Witnesses Order the State chose to have Officer Moberly stay at the counsel's table during the course of the trial. Appellant cites no authority for his claim that the procedure was improper. It is settled law, however, that the matter of separation of witnesses is left to the trial court's discretion and it further is accepted procedure to have a party choose one person to stay at counsel's table to aid counsel during the trial even though that person is a witness who will later testify. The State has this right as well as any other party and may choose a police officer even though he is also a witness. *Gee v. State,* (1979) 271 Ind. 28, 389 N.E.2d 303.

## IX

During the guilt phase of the trial Defendant offered into evidence a number of newspaper articles in an attempt to show that all the facts of his confession could have been learned from reading them. This was to support his position that perhaps due to his mental illness he confessed to a crime he did not commit and about which he might have learned from reading the newspapers. The trial court did admit into evidence two newspaper articles presented as Exhibits 2, 2A and 7, which Defendant was known to have read. The trial court excluded, however, other newspaper articles since there was no showing that Defendant had ever read or seen them. There was no showing or contention that

Defendant had, in fact, read any of the articles offered and excluded, but only the claim that he might have seen them since they existed and he might have or could have gotten the information from them about the details of the crime that he used in his confession.

An evidentiary ruling is reviewed only for an abuse of discretion. *Hare v. State, supra.* This Court will reverse a judgment only where such an error has caused prejudice to the defendant. *Springer v. State,* (1984) Ind., 463 N.E.2d 243. Again Appellant offers no authority in support of his contention that all of these articles should have been put into evidence. It appears the trial court reviewed these exhibits and permitted into evidence those that were shown to be relevant and excluded those that were not. We see no abuse of discretion that would justify a finding of reversible error.

### X

During final argument in the penalty phase of the trial the prosecutor stated the maximum term Defendant could get, other than the death penalty, was sixty (60) years. No objection was made to this statement at the trial nor does Defendant object at this time that it was improper for the State during penalty phase to remark as to possible penalties. The only argument Appellant makes now is that the statement of the State was inaccurate in that it was possible Defendant could have received consecutive sentences for murder, burglary, and robbery. The State points out, however, that the murder charge was a felony murder charge with the underlying felonies being robbery and burglary. It is settled law that a defendant could not receive separate sentences on both a felony murder and the underlying felonies. *Burris v. State,* (1984) Ind., 465 N.E.2d 171, *reh. denied.* Therefore, no reversible error is presented on this issue.

### XI

During the penalty phase of the trial, Defendant attempted to submit the personal opinions of Dr. Clear and Reverend Trevathan on society's use of capital punishment. They would have testified about religious and societal issues involved in the use of the death penalty. Defendant was allowed to argue such considerations to the jury but the trial court found the testimony of these witnesses improper evidence since it concerned only private opinions about the death penalty. We agree. The question of whether or not it is appropriate in our society to provide for the death penalty in certain cases is one to be answered by the legislature. The issue to be decided by a trial jury is whether the sentence is appropriate for the particular offense and the particular offender. *Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *reh. denied.*

Appellant cites *Lockett v. Ohio,* (1978) 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 for the proposition that the proper evidence should have been admitted since sentencing decisions should not be made in a vacuum. In *Lockett,* the Supreme Court of the United States was referring to relevant facts regarding the offense committed and the character of the offender, which was excluded by Ohio's law restricting the mitigating circumstances which were allowed to be considered. *Lockett* referred to evidence directly on point regarding the defendant and a particular crime at issue before the jury. The testimony proposed by Defendant in the instant case through the two witnesses was not evidence of the type presented in *Lockett,* but represented only general philosophical opinions regarding penalties approved by our State Legislature. The jury was fully informed of its options and its duty to recommend against the death penalty if proof of an aggravating circumstance was lacking or there was a finding that mitigating circumstances were not outweighed by the aggravating ones pursuant to Ind.Code § 35–50–2–9 (Burns Supp.1983). The trial court did not abuse its discretion by excluding the testimony of these two witnesses.

### XII

It is Defendant's contention there was insufficient evidence before the jury to sup-

port the conviction. Our review is to determine whether there was sufficient evidence of probative value from which the factfinder could make its findings beyond a reasonable doubt. If there is such evidence of probative value to support the conclusion of the jury we would not be inclined to overturn the conviction of the jury. *Smith v. State,* (1984) Ind., 465 N.E.2d 1105, *reh. denied.*

■ Defendant's argument is not that there was a lack of evidence before the jury but is an attack upon the credibility of that evidence. He attempts to point out inconsistencies in his confession which he claims shows his confession were not accurate recounts of what happened but were recitations of what he had heard elsewhere, indicating an insane and disabled mental condition. One instance of such discrepancy he points out is that in his confession he stated he stabbed Mrs. Johnson in the neck. The pathologist's statement said there were no wounds to her throat. Photos of her body, however, show that there was at least one stab wound below the cheekbone, very close to the neck area. There actually were stab wounds about the face and many other parts of the body to a great extent. He also refers to time discrepancies in testimony of witnesses and minor inconsistencies in some of the details. The jury had before it all of this evidence including the discrepancies now pointed out by the defendant. They also saw his confession, including the presentation of it through audio and videotape. The jury had more than ample facts before it on which to make the finding they did and we have no grounds to set aside that judgment merely on the basis of the credibility of such evidence.

### XIII

■ Finally, Appellant claims the death penalty statute in Indiana is unconstitutional and inappropriate in this case. He contends the death penalty is unconstitutional based on allegations of a lack of a proportionality review, the undue discretion given to prosecutors to decide whether or not the death penalty will be sought and the possibility of a mistake. His contentions have been considered adverse to Appellant's position in *Smith v. State,* (1984) Ind., 465 N.E.2d 1105, *reh. denied; Resnover v. State,* (1984) Ind., 460 N.E.2d 922, *cert. denied,* —— U.S. ——, 105 S.Ct. 231, 83 L.Ed.2d 160, and *Schiro v. State,* (1983) Ind., 451 N.E.2d 1047, *cert. denied,* 464 U.S. 1003, 104 S.Ct. 510, 78 L.Ed.2d 699. The procedures adopted in Indiana adequately meet the severe requirements of the United States Supreme Court to guard against the arbitrary and capricious or freakish application of the death penalty. *Gregg, supra; Pulley v. Harris,* (1984) 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29.

■ The jury recommended the death penalty to the trial judge and he made lengthy findings in sentencing Defendant. The trial judge indicated he had thoroughly examined the recommendation of the jury, the pre-sentence report filed in the case and the briefs and arguments by the parties. The trial judge then found that the State had proved beyond a reasonable doubt that Defendant Wisehart was guilty of four criminal counts: namely, murder, robbery, burglary, and theft. He further found beyond a reasonable doubt Defendant intentionally killed the victim while committing the crimes of robbery and burglary as charged. He then considered the aggravating and mitigating circumstances required by Ind. Code § 35–50–2–9(b). He found as an aggravating circumstance, proved beyond a reasonable doubt, that Mark Alan Wisehart committed murder by intentionally killing the victim while committing burglary and robbery. He then considered each mitigating circumstance outlined in Ind.Code § 35–50–2–9(c) and found there were no mitigating circumstances in this case to mitigate the aggravating feature set out above. He found the defendant did have a significant history of prior criminal conduct for which he had been incarcerated several times. The trial judge further found that Wisehart had no remorse or intention to correct those criminal propensities and, in fact, found that

Defendant demonstrated an intention to continue his criminal activities, killing his victims if necessary as evidenced by letters entered into evidence and other testimony. The trial judge proceeded to find there was some evidence the defendant had had occasional emotional problems in his life but there was no evidence he was under influence of extreme mental or emotional disturbance when he committed this murder. He found the victim did not participate in or consent to any of Defendant's conduct, nor was there any evidence that Defendant was an accomplice in the murder committed by another person with Defendant's participation being relatively minor. He referred to the fact that there was testimony of a possibility that there may have been another person or persons present but found there was no proof of any other person's participation and regardless of that possibility the defendant's participation in the event was major and resulted in intentional killing of the victim. He also found there was no evidence Defendant acted under the substantial domination of another person. He found there was no mitigation as to Defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law because of mental disease or defect, or intoxication. He referred to the fact that several witnesses testified the defendant was sane. The jury had the benefit of two psychiatrists and other witnesses regarding this issue. He then found that although Defendant's youth might have been a mitigating factor, Defendant had led a life of crime and been incarcerated in several institutions. He then found that the actions and attitude of the defendant showed prior criminal conduct and conduct presently showing a criminal personality totally devoid of a compulsion for legal behavior. "His very thought processes are bent on evil and the accomplishment of misdeeds and malevolent behavior." (Record at 2455). He found that even though young in years, the defendant was quite mature in the ways of conducting criminal activity. In reviewing the trial judge's findings and conclusions, we find

they are well supported by the evidence. Accordingly, we do not find the death penalty inappropriate in this case based on the crime, the manner in which it was committed, and the character of the perpetrator. We therefore affirm the trial court in all things, including its imposition of the death penalty.

This cause is remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C.J., and PRENTICE, and SHEPARD, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, Justice, dissenting.

The record facts material to the suppression issue presented in this appeal are as follows: Appellant Wisehart was living in the Christian Center, just around the corner from the Anderson Police Department. Detective Lloyd Brown and another officer went there and picked up appellant for questioning. Within a room in the police station, at 6:00 P.M. on October 15, 1982, the following took place according to Brown's testimony.

A  I have a procedure that I use when I advise anyone of their rights. I, uh, read, uh, the rights waiver in a question form.

    \*    \*    \*    \*    \*    \*

Q  And can you tell us what you did as far as this particular exhibit was concerned before you saw Mark Wisehart sign it?

A  Yes, I advised him that before we ask him any questions I had to make sure that he understood his rights. Then I asked him quote, I said, "Do you understand that you have the right to remain silent," and he answered that he did. Uh, asked him then, "Do you understand anything you say can be used against you in a court," and I again waited for a verbal reply of yes. Uh, I then asked him, "Do you understand that you have the right to con-

sult with an attorney and have an attorney present," and he again verbally said yes. I then asked him, uh, "Do you understand if you cannot afford a lawyer one will be appointed for you before any questioning if you so desire?" He again said yes. I then asked him, "Do you understand that if you decide to answer questions now without a lawyer present you will still have the right to stop answering at any time and do you also understand that you also have the right to stop answering at any time until you talk to a lawyer?" He again said yes. I then asked him to read this himself, uh, and if he would sign it at the bottom. Uh, I advised him by signing it he was not admitting or denying any guilt or giving up any rights. I explained to him that his signature was acknowledging that I had read his rights to him, that he understood them and that he had read them himself.

Q  Okay, and the waiver on the bottom, uh, did you read that to him or did he read it to your knowledge?

A  Uh, he gave me the indication that he read it himself. I did not read it to him.

Q  Okay. And did he ... After reading this did he sign it at that time?

A  Yes, he did in ... in my presence.

The form signed is the following:

## ANDERSON POLICE DEPARTMENT

### ADVICE OF RIGHTS

#### YOUR RIGHTS

Before we ask you any questions, you must understand your rights. You have the right to remain silent.

Anything you say can be used against you in a Court.

You have the right to consult with an Attorney and to have an attorney present.

If you cannot afford a lawyer, one will be appointed for you before any questioning, if you so desire.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

### WAIVER OF RIGHTS

I have read this statement of my rights and I understand what my rights are. I am willing to answer questions and/or make a statement. I do not want a lawyer at this time. I understand, and know what I am doing. No promises or threats have been made to me and no presure or coercion of any kind has been applied to me and I am acting voluntarily and of my own free will.

Appellant was interrogated until about 10:00 P.M., when he went to another place in the police station for a polygraph examination. Officer Fancher who gave the test testified as follows regarding the second advisement and waiver.

Q  What did you do?

A  I filled out the top portion. It was given to Mark Wisehart for him to read, which time he read it. I asked him if he understood his rights. He said, yes, he did. I give it to him to sign. He signed it. I witnessed it.

Q  Okay, you witnessed it. And after that what took place, after he signed this particular exhibit?

A  I interviewed him.

The form referred by Fancher is identical to the one used at 6:00 P.M. by Brown which is set out in full above in this dissenting opinion.

Fancher was permitted at trial to testify that appellant admitted killing the victim during his interview. This was appellant's first admission of guilt, and it was admitted against him at trial over a continuing objection.

Brown testified as to the events then next occurring. Fancher called him, and he went to where appellant had been inter-

viewed by Fancher. Brown's testimony continued

A  Okay. Uh, when I first saw him he had ... he, uh, was crying slightly. He had a couple of tears running down his cheeks.

Q  Okay, and is that all that you noticed about him at that time?

A  Uh, at that time he was kind of slouched down in a chair and when I came in he again recognized me and I asked him if it would be okay if Sergeant Moberly would also be present. He said that was fine and by about that time he had quit crying and, uh, he was getting back to his normal self that I'd ... like I'd seen him before.

Q  Did he make any further statements to you at that time:

A  Yes, he did.

Q  What statements did he make?

A  Uh, he admitted that he had killed Marjorie Johnson.

A  Okay. Could you relate as best you can what ... what he said and what you folks said, you and Sergeant Moberly?

A  Uh, we asked him if we could talk to him at this time to get a statement from him while we were still in this same area and he said it was alright; that he wanted to talk. He told me that ... first of all that he was sorry that he lied to me when I talked to him earlier in the evening and he also wanted me to convey to Detective Tracy, uh, to tell him that he was sorry for lying to him also. Uh, we then started asking him how this murder had come about. He at that time started to tell us that he'd been at the Christian Center in the afternoon and that he had decided two weeks prior that he was going to kill Marjorie Johnson. Brown then went on to testify over the continuing defense objection, to a forty-five minute dialogue during which appellant described his crime in great detail, and to a description of events in the interrogation room during the dialogue. It may be noted, that this for-ty-five minute dialogue between appellant and Brown resulted in the second oral confession, the first having been made to Fancher, and was itself not preceded by new warnings, over and above those previously given by Brown at 6:00 P.M. and those given by Fancher at about 10:00 P.M., and by waivers, over and above those purportedly given by appellant at 6:00 P.M. and 10:00 P.M.

Detective Brown, after concluding his testimony about the detailed oral confession, testified to what happened next.

Q  And then what took place?

A  We asked Mark if he would accompany us back to the police station, uh, back to the library and give us a ... a signed ... a written statement which consisted of it being typed as he dictated it and then he could read it and sign it if he felt that it was true and accurate. And he did say that this was fine; he would do this.

Q  In the conversation that you had with him that took half an hour to forty-five minutes what was his demeanor during that time?

A  Uh, it was calm. Uh, he wasn't upset, uh, to the fact that he was nervous. Uh, and one thing that ... that particulary struck me is while he was smoking a cigarette sometimes he would blow a smoke ring.

Q  Now the statement, the written statement what area was that taken?

A  Uh, that ... What area of the police department:

Q  Yes, police department.

A  That was ... that was taken in the same library that the original interview had started in.

Q  Can you tell us what happened ... Uh, well, did anything happen just prior to taking that statement?

A  Uh, he was again advised of his right. Uh, they were read aloud to him by Lieutenant Moberly as they are stated on the statement form and he was asked if he understood his rights and he stated that he did. Uh, at this time

he was asked to dictate in his own words and by the notes that we had taken earlier if he would give us another statement and he did and ... or he said that he would and he did.

Q This is in typewritten form; is that correct?

A Yes, it is.

Q And who typed?

A Uh, Sergeant Moberly if I remember correctly is the one that actually typed it himself.

Q Can you, please, just relate how ... just how it took place that ..., you know, how the ... were there questions asked?

A There were questions asked of him. Uh, he related ... he gave answers to the questions and also the questions some of them were, uh, based on the notes that had been taken earlier by Lieutenant Moberly when we were taking the oral statement. And then as the statement was typed some additional questions about details were asked of Mark and he answered them.

The above recital provides the totality of material upon which the suppression issues must be resolved. From this material, one must conclude that those events, including warnings and purported waivers occuring after appellant's first complete admission of guilt to officer Fancher during the polygraph interview, are irrelevant and must be disregarded. It is the warnings and purported waivers occurring prior to that interview which are relevant, and it is upon their sufficiency which the admission of the Fancher confession of guilt and all subsequent confessions and evidence stemming therefrom depend, as a matter of legal principle. We are left therefore with the conduct of appellant in signing the identical waiver forms at 6:00 and 10:00 P.M., and Detective Brown's statement accompanying the first signing in which he orally advised appellant "I advised him by signing it [the waiver] he was not admitting or denying any guilt or giving up any rights." (record at 505). It is from these three elements, taken within the circumstances,

upon which this court must decide whether the trial court was warranted in concluding beyond a reasonable doubt that appellant knowingly, intelligently and voluntarily relinquished the privilege against self-incrimination. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. *Edwards v. State* (1980), 274 Ind. 387, 412 N.E.2d 223.

In determining whether a valid waiver of *Miranda* rights has occurred, we look to the circumstances surrounding its giving to determine whether it was "induced by any violence, threats, promises, or other improper influence." *Montes v. State* (1975), 263 Ind. 390, 332 N.E.2d 786, 792. The burden is on the State to prove beyond a reasonable doubt the knowing and voluntary character of the waiver. *Burton v. State* (1973), 260 Ind. 94, 292 N.E.2d 790. Furthermore, the signing of a waiver form does not conclusively show a valid waiver. *Dickerson v. State* (1972), 257 Ind. 562, 276 N.E.2d 845. Here, the waiver section of the form was not read to appellant, but he was asked to read that part for himself. This is true as to both written waivers. Thus there was no aid or assistance provided appellant in understanding that section, by either interrogator. Indeed the first reading by appellant was accompanied by an explanation by the interrogator which was contrary to the actual legal consequence of signing, namely that by signing he was not giving up any right. The further point needs to be made here, that the waiver section of the form is obscure in the manner in which it approaches waiver. The form does not specifically inform the reader that a choice to give up or relinquish something is at stake. A lawyer might perceive an inference that a "giving up" or "relinquishing" was occurring, but it would be difficult for a person untrained in this area to do so. This obscurity existed in both waiver sections, and since only four hours separated the two acts of signing them, the enhancement of the obscurity flowing from Detective Brown's direct statement that appellant was not giving up any rights by signing, impacted both. This does not comport with the requirements of

the federal constitution governing waivers of constitutional rights. I would therefore reverse this conviction for a new suppression hearing to establish what evidence was acquired by the State by reason of this constitutional violation, and a new trial at which appellant's admissions of guilt and any additional evidence acquired by the state by exploiting those admissions, are excluded.