Dennis R. ROARK, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 45S00–9302–DP–234.

Supreme Court of Indiana.

Dec. 19, 1994.

Rehearing Denied March 22, 1995.

Marce Gonzalez, Jr., Hilbrich, Cunningham & Schwerd, Merrillville, for appellant.

Pamela Carter, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Justice.

We review and affirm the murder convictions of defendant Dennis R. Roark. We reverse defendant's death sentence and sentence defendant to 200 years in prison, consisting of three consecutive sentences of fifty years for each of the murder convictions, such terms to be served consecutively to the 50 year sentence for voluntary manslaughter already imposed by the trial court in this case.[1]

### Facts

The defendant, age 25, lived in Betty Waggoner's home in Hammond, Indiana, with Betty Waggoner, Mary Waggoner, age 19, who was defendant's girlfriend, and defendant's and Mary Waggoner's two children, son Dennis Waggoner, age 20 months, and daughter Elizabeth Waggoner, age four

months. The defendant recounted the following events in his statement to the police that was admitted at trial. On February 3, 1989, at about 5:00 a.m., the defendant returned home after a night of drinking. Mary Waggoner informed him that her mother would yell at him for staying out all night. The defendant told Mary Waggoner that he would rather leave than be yelled at by her mother. Mary Waggoner decided that she and her children would leave with him. Betty Waggoner approached the defendant and Mary Waggoner as they were about to leave, grabbed their son, and stated that she would kill herself if they left. She then lunged toward the defendant with a knife. The defendant wrestled the knife away from Betty Waggoner and stabbed her. He then stabbed Mary Waggoner and their two children multiple times each and left the house.

Later that same morning, firemen were called to the Waggoner home. The dead bodies of Betty, Mary, Dennis, and Elizabeth Waggoner were found in the home. Although the bodies of Betty and Mary Waggoner were burned, autopsies revealed that they had been stabbed to death before the fire broke out. Dennis Waggoner died from smoke inhalation and internal injuries due to stab wounds. Elizabeth Waggoner died from burns suffered during the fire and external injuries due to stab wounds.

Defendant was charged with the knowing or intentional murders[2] of each of Betty Waggoner, Mary Waggoner, Dennis Waggoner, and Elizabeth Marie Waggoner. The State also sought the death penalty.[3] As aggravating circumstances justifying the death penalty, the State charged that defendant murdered two or more persons[4] by knowingly or intentionally killing Mary Waggoner, Dennis Waggoner, and Elizabeth Marie Waggoner and that two of the victims, Dennis Waggoner and Elizabeth Marie Waggoner were less than twelve years of age.[5]

---

1. This appeal follows a new trial on the crimes charged following our reversal of the defendant's convictions in an earlier trial. *Roark v. State* (1991), Ind., 573 N.E.2d 881.

2. Ind.Code § 35–42–1–1(1) (1988).

3. Ind.Code § 35–50–2–9 (1988).

4. Ind.Code § 35–50–2–9(b)(8) (1988).

5. Ind.Code § 35–50–2–9(b)(12) (1988).

Following trial, a jury found defendant guilty of the voluntary manslaughter of Betty Waggoner,[6] and the murder of Mary Waggoner, Dennis Waggoner, and Elizabeth Marie Waggoner. Following the death penalty phase of the trial, the jury recommended that defendant not be sentenced to death.

At a subsequent sentencing hearing, the trial court reviewed and weighed aggravating and mitigating circumstances, considered the jury's recommendation against death, and then sentenced defendant to death. Defendant appeals his convictions for Murder and his death sentence. He does not appeal his conviction for Voluntary Manslaughter.

### Issues on Appeal

In addition to challenging the imposition of a sentence of death in this case, defendant contends that (1) the trial court erred in denying his motion to suppress his confession and (2) the evidence does not support beyond a reasonable doubt the verdict that he committed murder as opposed to voluntary manslaughter in the deaths of Mary Waggoner and the two children.

### 1. Motion to Suppress Confession.

Defendant contends that the trial court committed reversible error in when it denied the motion to suppress defendant's confession because defendant did not knowingly, intelligently, and voluntarily waive his *Miranda* rights. Following his arrest, defendant was interrogated by Officer Mancielwicz. At the outset of the interrogation, Officer Mancielwicz presented defendant with a waiver of rights form, which defendant read. After defendant read the form, Officer Mancielwicz told defendant, "Okay, what this means Denny, you're not waiving your rights." Defendant then signed the waiver form and gave a statement incriminating himself. The trial court denied defendant's motion to suppress this statement. At trial, the statement was read to the jury over defendant's objection.

■ In order for defendant to have waived or relinquished his right against self-incrimination, the record must show that he knowingly, intelligently, and voluntarily relin-

quished that right. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); *Edwards v. State* (1980), 274 Ind. 387, 390–91, 412 N.E.2d 223, 225. The burden is on the State to prove beyond a reasonable doubt that the waiver was knowingly and voluntarily made. *Miranda*, 384 U.S. at 475, 86 S.Ct. at 1628; *Burton v. State* (1973), 260 Ind. 94, 105, 292 N.E.2d 790, 797–98. Such claims are reviewed considering the totality of the circumstances, based on a review of the entire record. *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 279–80, 4 L.Ed.2d 242 (1960). Here, defendant argues, there is insufficient proof that he appreciated both the gravity of the waiver and the meaning of the words. He points out that, while reading from a form with a correct statement of his rights, an authority figure was assuring him that he really would not be giving up any of his rights if he gave a statement. This scenario, defendant contends, would be confusing to a person of average intelligence, let alone a man of defendant's limited intelligence.

■ We first observe that defendant's limited intelligence alone does not render his confession involuntary. Indeed, in *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), the United States Supreme Court said that the purpose of the Fifth Amendment's testimonial privilege against self-incrimination and the requirements of *Miranda* are to protect against police misconduct. Although a person's mental condition is relevant to the issue of susceptibility to police coercion, where the person voluntarily makes a confession without police coercion the confession may be considered in spite of the mental condition. *Connelly*, 479 U.S. at 167, 107 S.Ct. at 522; *Pettiford v. State* (1993), 619 N.E.2d 925, 928. Thus the issue here really turns on whether Officer Mancielwicz's statement to defendant was coercive within the meaning of *Connelly*.

The State contends this situation is similar to that faced by this court in an earlier death penalty case, *Wisehart v. State* (1985), Ind., 484 N.E.2d 949 *reh'g denied, cert. denied,*

---

**6.** Ind.Code § 35–42–1–3(a) (1988).

476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 556 (1986). In that case defendant also claimed the trial court erred in failing to grant his motion to suppress his confessions. His argument was based on the statement made by a detective during the suppression hearing. At that hearing, the detective stated: "I advised him by signing it [the waiver] he was not admitting or denying any guilt or giving up any rights." Defendant contended that this indicated he was fooled or tricked into thinking that signing of a rights waiver did not constitute the waiver of any rights and therefore was an improper solicitation of his confession. In analyzing this claim, we examined the record and found that the defendant had been fully advised of all of his *Miranda* rights prior to having given any statements to the police. We concluded that the detective's statement at the suppression hearing did not purport to be a direct quotation of what he may have told Wisehart, but was only a paraphrase of the standard rights advisement, in particular stressing that Defendant could still terminate the interrogation and retain counsel. Over the dissent of Justice DeBruler, we decided that because there was no showing that the police had extracted the confession by threats or violence or obtained it by any direct or implied promises or by the exertion of any improper influence, the trial court had committed no reversible error in denying the motion to suppress. *Wisehart*, 484 N.E.2d at 952.

■ After carefully reviewing the record here, we find this situation is controlled by *Wisehart*. The defendant had a full advisement of his rights and acknowledged that he understood that he was agreeing to the use of his statements against him at trial. Even after receiving what defendant now terms a "mixed message," he showed no hesitancy or apprehension about proceeding. In this respect the case differs from our recent opinion in *Lynch v. State* (1994), Ind., 632 N.E.2d 341, 343, in which we held a confession inadmissible where, after defendant expressed reluctance about signing a waiver form, the interrogator misled defendant about the

meaning and consequences of "waiver," and that behavior by the interrogator led to the subsequent statement. The confession here was properly admitted.

### 2. *Sufficiency of Evidence of Murder.*

■ As described above, following the stabbing death of Betty Waggoner, for which defendant was convicted of Voluntary Manslaughter, defendant went on to stab to death the other three victims. To find the defendant guilty of voluntary manslaughter, the jury was required to find that all of the elements of the crime of Murder existed except that the defendant acted under "sudden heat." Ind.Code § 35–42–1–3(a) (1988). Defendant contends that the subsequent three stabbings were part of a continuing reaction to the provocation caused by Betty Waggoner. The knife used in the stabbings was first produced by Betty Waggoner, and once defendant wrestled the knife away from Betty Waggoner, his subsequent actions were carried out in rapid succession while, he argues, still under the sudden heat triggered by Betty Waggoner's provocation. In defendant's view, there was no evidence presented at trial to support a finding that a cooling off period existed between the provocation by Betty Waggoner and defendant's chain of subsequent events. The significance of defendant's argument lies in the fact that if he is guilty of the voluntary manslaughter rather than the murder of all four victims, he is not eligible for a sentence of death.

We believe that the issue of whether the defendant continued to act under "sudden heat" was properly left for the jury to decide. With defendant's own statement to police made the same day as the killings, the jury had before it sufficient evidence from which it could infer that the killings of Mary Waggoner, Dennis Waggoner, and Elizabeth Waggoner were not committed while defendant was acting under sudden heat.[7]

### *Death Sentence Review*

In *Martinez Chavez v. State* (1989), Ind., 534 N.E.2d 731, *reh'g denied* (1989), 539

---

7. Indeed, defendant may have invited this result when he said during final argument in the guilt phase, "Simply because you return a verdict say of Voluntary Manslaughter for Count I [Betty

Waggoner] does not mean you have to return the same verdict for Count II, III or IV. Anyone of the combinations is possible...."

N.E.2d 4, the trial court imposed a sentence of death even though the jury had recommended against the death penalty. We set aside the death sentence and ordered a term of years, saying that "[b]ecause reasonable people could differ on the appropriateness of the death penalty" for the defendant, the trial court should have adopted the jury's recommendation. *Id.* at 735. In affirming our decision on rehearing, we added that when a jury recommends against imposing the death penalty, "[a] trial court can proceed to impose a penalty of death only ... when all the facts available to the court point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable." *Martinez Chavez*, 539 N.E.2d at 5 (on rehearing).

Although we applied the *Martinez Chavez* standard to set aside death sentences in *Jackson v. State* (1992), Ind., 597 N.E.2d 950, *reh'g denied, cert. denied,* —— U.S. ——, 113 S.Ct. 1424, 122 L.Ed.2d 793 (1993) and *Kennedy v. State* (1993), Ind., 620 N.E.2d 17, *reh'g denied,* we have concluded that the obligation that standard places on the trial court is inconsistent with the independent sentencing authority which the trial court has under the death penalty statute.

### Trial Court Sentencing

■ Our death penalty statute provides three distinct steps which the trial court must take in reaching its sentencing decision in cases in which the jury has found the defendant guilty of Murder and the State seeks the death penalty. First, the trial court must find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Ind.Code § 35–50–2–9(e)(1) (1988) (now Ind.Code § 35–50–2–9(i)(1) (1993)). Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. Ind.Code § 35–50–2–9(e)(2) (1988) (now Ind.Code § 35–50–2–9(i)(2) (1993)). This evaluating and weighing process should be described in the trial court's sentencing statement. Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. Ind.Code § 35–50–2–9(e) (1988).

However, the death penalty statute also provides that the trial court is not bound by the jury's recommendation. *Id.* We have come to the conclusion that to require the trial court to test a jury's recommendation against death by the *Martinez Chavez* standard interferes with the trial court's statutory freedom from being bound by the jury's recommendation.

■ We emphasize that the statute explicitly requires that before making the final determination of the sentence, the trial court must consider the jury's recommendation. Ind.Code § 35–50–2–9(e). To facilitate appellate review, we will require in future cases that the trial court briefly summarize its consideration of the jury recommendation in its sentencing statement. When the trial court has a jury recommendation against death before it, the single essential feature of this part of the sentencing process is that at the point of final decision the court reflect upon the jury recommendation against imposing death. A judge who proceeds in this manner will have satisfied the requirement of due consideration of such jury recommendation. In cases where the jury recommends against death, this consideration reflects appreciation that the jury's recommendation is a statement by the "conscience of the community" [8] that each and every member of a jury that unanimously found the defendant guilty of murder has reconciled himself or herself to returning to the homes and workplaces of the community where in all likelihood the murder occurred, having unanimously recommended against a sentence of death in the face of the State's request for the death penalty. After such due consideration of the jury recommendation, the trial court must render its judgment.

8. See *McKoy v. North Carolina,* 494 U.S. 433, 452, 110 S.Ct. 1227, 1238, 108 L.Ed.2d 369 (1990) (Kennedy, J., concurring in the judgment) ("Jury unanimity ... is an accepted, vital mechanism to ensure that real and full deliberation occurs in the jury room, and that the jury's ultimate decision will reflect the conscience of the community.").

■ Article 7, Section 4 of the Indiana Constitution provides that "[t]he Supreme Court shall have, in all appeals of criminal cases, the power to review and revise the sentence imposed." Although our rules for appellate review of sentences require that great deference be given the judgment of the trial court, Ind.Appellate Rule 17, where the sentence is death, those rules "stand more as guideposts for our appellate review than as immovable pillars supporting a sentence decision." *Spranger v. State* (1986), Ind., 498 N.E.2d 931, 947 n. 2, *reh'g denied* (1986), 500 N.E.2d 1170, *cert. denied*, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 536 (1987). In fact, we have made clear that "this Court's review of capital cases under Article 7 is part and parcel of the sentencing process." *Cooper v. State* (1989), Ind., 540 N.E.2d 1216, 1218.

■ During appellate review of a death sentence where the jury has recommended against death, two separate and distinct issues are always presented for our consideration: (i) whether the trial court sentencing statement demonstrates due consideration of the jury recommendation; and (ii) whether this Court, upon independent reconsideration of a jury recommendation against death, nevertheless concludes that the death penalty is appropriate. In making the second of these inquires, this Court will apply the *Martinez Chavez* test as our standard of appellate review. Before we affirm a sentence of death, it must appear to us that all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable. *Martinez Chavez*, 539 N.E.2d at 5 (on rehearing).

9. The comprehensiveness of the order and appendix has greatly facilitated our review, and we express our appreciation to the trial court for its efforts in this regard. Included in its appendix is the trial court's analysis of the standards to be employed by the trial court when considering imposing a sentence of death where the jury has recommended against death. We gave careful attention to the trial court's analysis in preparing our discussion of sentencing in such cases set forth above.

10. Ind.Code § 35–50–2–9(b)(8) (1988).

■ In this case, the trial court sentenced defendant to death notwithstanding the jury's recommendation against death. In a comprehensive sentencing order with appendix setting forth "Reasons for Imposition of Death Penalty,"[9] the trial court first found that the State had proved beyond a reasonable doubt the charged aggravating circumstances of murdering two or more persons[10] and that the victims were less than twelve years of age.[11] Of this there was no question and defendant admitted as much in closing argument. The trial court also recognized the following mitigating circumstances: (i) that the jury recommended that the death penalty not be imposed in this case; (ii) that defendant had no significant history of prior criminal conduct;[12] (iii) that defendant was under a mental and/or emotional disturbance, arguably extreme, when he committed the murders because of a confrontation with Betty Waggoner over his intention to remove his children from her home;[13] (iv) that defendant's father was an alcoholic who physically abused his mother during defendant's adolescent and juvenile years; (v) that the weapon used by the defendant was first introduced by Betty Waggoner who attempted to stab or cut defendant with it; and (vi) that defendant had been incarcerated for three years and nine months (including one year and ten months on death row) without any significant write-ups, during which time he had made some efforts at self-improvement. The trial court, indicating that it had carefully weighed and evaluated both the aggravating and mitigating circumstances, then found that the aggravating circumstances "overwhelmingly" outweighed the mitigating circumstances and sentenced defendant to death.[14]

11. Ind.Code § 35–50–2–9(b)(12) (1988).

12. Ind.Code § 35–50–2–9(c)(1) (1988).

13. Ind.Code § 35–50–2–9(c)(2) (1988).

14. The trial court also sentenced defendant to 50 years for the voluntary manslaughter of Betty Waggoner, enhancing the presumptive 30 year sentence by the maximum 20 years in recognition of the murders that were committed at the same time.

We conclude that the trial court properly followed the requirements of our death penalty statute. We also conclude that the trial court's sentencing statement demonstrates due consideration of the jury recommendation.

■ We now proceed to our independent reconsideration of the jury recommendation against death to decide whether the death penalty is appropriate here. As discussed above, we conduct this inquiry by asking whether all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable. Certainly in the face of the multiple stabbings of a teenage woman and two very young children, that burden is very high. Yet after careful study of the facts related to defendant's mental condition, which point away from the imposition of the death penalty, and after considering the mitigating circumstances found by the trial court, it does not appear to us that all the facts in the record point so clearly to· the imposition of the death penalty that the jury's recommendation was unreasonable.

At trial, the defense presented the testimony of Dr. Jack Arbit,[15] who had doctorate in clinical psychology, and who maintained a private practice in the Chicago area while also occupying positions on the faculties of the Northwestern University and Loyola–Chicago University medical schools.[16] Dr. Arbit testified that during a two hour examination of defendant in September of 1989, he administered a battery of intelligence and psychological tests and clinically evaluated defendant. According to this testimony, defendant had had two brief previous contacts with mental health professionals, had a history of serious alcohol and drug abuse, and had been the subject of a violent homosexual attack. Defendant achieved a full-scale IQ score of 72 which Dr. Arbit characterized as "border-line mental defective ... at about

the third or fourth percentile." With respect to two tests administered to determine whether there was impairment of brain function, Dr. Arbit found evidence of impairment that he observed was consistent with defendant's alcohol and drug abuse history. With respect to two personality tests, Dr. Arbit found defendant to have very poor emotional control and very poor self concept, marked by characteristics that are usually outgrown during childhood. It was Dr. Arbit's opinion that defendant's "ability to maintain control of feelings of aggression, rage, hostility, was significantly and markedly impaired ... by the history of drug abuse that affected his brain and by the fact that his rage ... had reached the point where there was just no way he could turn it off." Dr. Arbit also discussed the role of the brain cortex in controlling human behavior and the way in which chronic alcoholism can impair its function. It was Dr. Arbit's opinion that the control quality of defendant's brain cortex was impaired. Dr. Arbit testified that defendant was suffering from major depressive disorder with dysthemia, a recognized mental illness under the Diagnostic and Statistical Manual of the American Psychiatric Association. This disease, Dr. Arbit testified, would be enough to make a person unable to appreciate the wrongfulness of his conduct at the time of such conduct. Finally, it was Dr. Arbit's opinion that therapy could be useful to defendant.

This testimony was offered in an effort to establish an insanity defense, but Dr. Arbit offered no opinion on defendant's sanity. Two court-appointed psychiatrists testified that in their opinion defendant was sane at the time of the killings,[17] and the defendant essentially abandoned the insanity defense in closing argument. However, defendant stressed Dr. Arbit's testimony during closing arguments both at the guilt phase, contending that he should be found guilty of volun-

---

**15.** Dr. Arbit was ill and unable to attend the trial in person. His testimony from defendant's first trial was read into the record in the presence of the jury.

**16.** Dr. Arbit testified that he had appeared as a witness in criminal cases approximately five to ten times during his thirty years of practice.

**17.** The court-appointed psychiatrists only interviewed defendant and did not administer the battery of tests used by Dr. Arbit.

tary manslaughter but mentally ill on all counts, and again at the penalty phase, urging that the jury recommend against the death penalty. Given the comprehensive and persuasive testimony of Dr. Arbit about defendant's history (his childhood, alcoholism, and drug abuse), his limited intelligence, his mental impairment and illness, taken together with the mitigating circumstances recognized by the trial court, it does not appear to us that all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation was unreasonable. We therefore set aside the penalty of death.

### Conclusion

We affirm defendant's convictions for Murder. We reverse the sentence of death and impose consecutive sentences of 50 years for each murder conviction. Each sentence shall be served consecutively to the sentence of 50 years imposed by the trial court for defendant's voluntary manslaughter conviction, for a total sentence of 200 years.

DeBRULER and DICKSON, JJ., concur.

SHEPARD, C.J., concurs and dissents with separate opinion, in which GIVAN, J., concurs with the observation that Judge Clement's sentencing of Appellant should be affirmed.

GIVAN, J., dissents with separate opinion.

SHEPARD, Chief Justice, concurring and dissenting.

I join in affirming the convictions and concur in the revised version of the *Martinez–Chavez* standard. Our clarification of this standard is the direct result of Deputy Attorney General Arthur Thaddeus Perry's request that we revisit the subject, and I thank him and appellant's counsel Marce Gonzalez, Jr., for superb work which made our task easier.

Still, it is possible for individual justices to apply a standard to a particular appeal and reach a different conclusion. I reach a different conclusion here, and I would affirm the penalty imposed by Judge Clement.

GIVAN, J., concurs with the observation that Judge Clement's sentencing of appellant should be affirmed.

GIVAN, Justice, dissenting.

I respectfully dissent from the majority opinion in their setting aside of the death penalty. As recited by the majority opinion, Judge Clement did an excellent job in complying with this Court's rules in overriding a jury's recommendation against the death penalty. Judge Clement had every fact considered by the majority opinion before him. He had before him the witnesses discussed in the majority opinion and could observe the demeanor of those witnesses, where as this Court had only the written record for reference. Under these circumstances, I cannot justify overruling Judge Clement's carefully drafted decision to order the death sentence.

I would affirm Judge Clement.