**Latine Marie Gordon DAVIDSON, Appellant,**

v.

**STATE of Indiana, Appellee.**

**No. 10S00–8707–PC–628.**

Supreme Court of Indiana.

Aug. 29, 1990.

Michael T. Forsee, Public Defender, Jeffersonville, for appellant.

Linley E. Pearson, Atty. Gen., Lisa A. McCoy, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in appellant's conviction of two counts of Murder, for which she was sentenced to two consecutive enhanced terms of sixty (60) years each for a total executed sentence of one hundred twenty (120) years, plus court costs of $71. Appellant now comes before us via Ind.R.P.C.R. 2 upon her belated direct appeal.

The facts are: In the early morning hours of July 23, 1983, police were called to appellant's address regarding a possible infant drowning. Appellant's daughter, Shaccara, was transported to the hospital, but resuscitation measures failed to revive her. Appellant calmly explained that Shaccara had been suffering convulsions in the night, that she had put her in the bathtub to reduce her fever, and that after heating a bottle in the kitchen, she returned to the bath to find the baby face down and limp in the water.

Dr. Frances Masser, the pathologist who performed the autopsy on Shaccara, testified the baby's death was consistent with fresh-water drowning. She stated that a 14–month–old child would hold her head above water unless she were rendered unconscious, which would require some form of injury or disease leaving signs apparent during an autopsy, and that no such signs were found. Dr. Masser also testified that an adult easily could drown a 14–month–old child simply by holding her head under five to six inches of water.

On June 20, 1983, appellant had applied for AFDC welfare payments, and on July 5, 1983, she was denied payments. On July 7, appellant was informed that a policy on Shaccara's life, previously maintained by her deceased mother, would lapse unless she took over paying the premiums. Appellant was then beneficiary of the policy. She agreed to do so, obtained some cash from a person then present and paid the premium. In December of 1983, appellant received $5000 in benefits from the life insurance policy on Shaccara.

In October of 1983, appellant gave birth to a son she named Rodrigues Sanchez Escabar Felicciones, and two weeks later they moved to Louisville to live with one Darrell Cook. Two months later she moved in with her aunt, Dodie Benedict, in New Albany, but left 2–month–old Rod with Juan Davidson at the latter's mother's home in Jeffersonville, where appellant herself moved in May of 1984.

In June of 1984, appellant, Rod, and Juan moved in with Linda Jones and her husband in New Albany. At this time, appellant was six months pregnant, and while living with the Joneses she married Juan Davidson. Linda Jones testified that while the Davidsons lived in her home, appellant took care of Juan while Juan took care of Rod; that appellant wished aloud that Rod were not around because Juan spent more time with Rod than with her; and that appellant disciplined Rod by holding him upside-down in the bathroom and smacking his bottom with the sole of a wet shoe.

Also while living with the Joneses, appellant took out a life insurance policy on Rod worth $3000; this coverage lapsed after two months due to nonpayment. The selling agent testified that appellant had been disappointed at her inability to purchase vastly greater coverage on Rod's life.

In October of 1984, appellant gave birth to another son, who she named Mersherjuan Olean Davidson. Appellant and her husband, Juan, both were unemployed at this time, and after a partial denial of A.F.D.C. benefits, they moved back into the home of Juan's mother, Lola Davidson, about one month after Mersherjuan's birth. Appellant made it apparent that she disliked this arrangement and tolerated it only because she was unable to afford a home of her own.

On January 3, 1985, appellant contacted an agent for the National Life & Accident Insurance Company and applied for a policy on Rod to become effective that same day. For a monthly premium of $18.47, she purchased a policy having a face value of $20,000 with an accidental death (double indemnity) rider. The selling agent testi-

fied that at the time of writing Rod's policy, he was unaware of his company's regulation imposing a $10,000 ceiling on policies written to insure the lives of children whose parents receive A.F.D.C. benefits.

On the following day, Juan found 14–month–old Rod dead in the bathtub. Rod was taken by ambulance to the Clark County Hospital, where the emergency room physician attempted resuscitation but pronounced him dead thirty-five minutes after arrival. The doctor testified he found Rod's mouth and lungs full of frothy water but could find no signs of any bruising, swelling, lacerations or abrasions. He also testified that there was no reason why a 14–month–old child could not right himself after falling into six inches of water unless he were to be rendered unconscious, which would leave some sign of the trauma causing the loss of consciousness.

On the day of Rod's demise, appellant had awakened around eleven a.m. and then had run a bath for herself and Rod. She next took Rod downstairs, fed him, and watched soap operas with her mother-in-law Lola and a neighbor, Betty Johnson, until around one p.m. when appellant remarked she was going to put Rod down for his nap with her husband Juan, who was still in bed.

After taking Rod upstairs, appellant left the house to buy a bag of beans, ostensibly because there was no food in the home. After returning from the store, she complained of cramps and back pain and went to lie down in Lola's downstairs bedroom. She then arose and obtained Betty Johnson's permission to go to the latter's apartment down the hallway to use her telephone. After appellant left, Juan got up and discovered Rod lying in the water in the bathtub.

Various witnesses testified to appellant's unemotional demeanor subsequent to the discovery of Rod's drowning. When Juan's brother, James, started that evening to cook the beans appellant had purchased at the store, she told him not to cook the beans because she needed them for evidence. Appellant closely tracked news coverage of Rod's death and corrected out loud one article which reported Rod had been found with his arms extended from his sides; she stated his arms had lain next to his sides, and then added that Juan had told her this fact.

Betty Johnson's daughter, Regina, testified appellant had told her that she was assured of collecting Rod's life insurance proceeds because his death would be resolved either as accidental or as the result of Lola's child neglect. Appellant also told Regina of her plans to buy a car, take a honeymoon trip with Juan, and move into a house of their own.

Instead, however, the police investigation led to a coroner's inquest, a grand jury investigation, and a Child In Need of Services (CHINS) proceeding concerning appellant's remaining child, Mersherjuan. After consulting with her attorney, appellant made an agreement with the prosecutor to undergo a polygraph examination into the circumstances of the deaths of Shaccara and Rodrigues, stipulating the results would be admissible in any subsequent trial. The polygraph examiner concluded appellant was not telling the truth about her children's deaths. Consequently, she was charged with the murders of her two children, which charges were joined for trial and culminated in the instant convictions.

Appellant contends the trial court erred in denying her pretrial motions to dismiss the indictment and to sever the offenses for separate trails. She argues that, under Ind.Code § 35–34–1–11, she was entitled to separate trials as a matter of right because the murder charges were joined for trial "solely on the ground that they [were] of the same or similar character;" that the State charged the two murders together so as to be able to file a death penalty request upon the ground, set forth in Ind.Code § 35–50–2–9(b)(8), that the defendant had committed another murder; and that she was prejudiced by the joinder because the jury was likely to infer a criminal disposition on her part to commit infanticide.

Appellant cites *State v. McCormick* (1979), 272 Ind. 272, 397 N.E.2d 276 for the proposition that in order to avoid unduly

prejudicing the jury by exposing them to evidence of two murders, separate murder trials are required to support a death penalty count under § 35–50–2–9(b)(8). In *McCormick*, both the defendant and the State stipulated that the killings were not related or connected in any way. However, in the case at bar, the murders are related; thus *McCormick* is not applicable. Here, the murders were joined for trial and, while convictions for both would have been prerequisite to sustaining a death recommendation under subsection b(8) of the statute, no danger existed of doing so upon a lesser standard of proof than beyond a reasonable doubt, and because the jury did not recommend the death penalty, appellant in fact suffered no prejudice in the penalty phase. Thus the gist of appellant's complaint is her contention that the instant murder charges were not sufficiently related to properly be joined for trial.

Indiana Code § 35–34–1–9(a) allows joinder of offenses in the same indictment or information when the offenses:

"(1) are of the same or similar character, even if not part of a single scheme or plan; or

(2) are based on the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan."

Indiana Code § 35–34–1–11(a) grants a defendant an absolute right to severance of offenses which have been joined "solely on the ground that they are of the same or similar character."

■ Appellant first argues her motion to sever should have been granted as a matter of right because the charges were joined solely because they were of the same or similar character. In the case at bar, a pattern is evident of insuring an infant's life prior to the infant's suspicious drowning; the common *modus operandi*, as well as the same motive, serve to connect the crimes sufficiently to justify joinder for trial over the defendant's motion for severance. *See Jameison v. State* (1978), 268 Ind. 599, 377 N.E.2d 404; *Ford v. State* (1987), Ind.App., 506 N.E.2d 835.

■ Appellant argues that even if severance of right was not required, the complexity of the voluminous evidence adduced at trial undoubtedly confused the jury and rendered them unable to distinguish the evidence and intelligently apply the law as to each offense as per the statute. She also maintains, again, that she was unduly prejudiced by the joinder and by the trial court's refusal of her Tendered Instruction No. 22, which would have told the jury not to draw inferences regarding one murder count in determining guilt on the other count.

■ Unless the defendant is entitled to severance as a matter of right under Ind. Code 35–34–1–11(a), whether to sever multiple charges is a matter within the trial court's discretion, taking into account the three factors listed in the statute, and a denial of severance will be reversed only upon a showing of clear error. *Dudley v. State* (1985), Ind., 480 N.E.2d 881, *cert. denied* (1989), —— U.S. ——, 109 S.Ct. 1655, 104 L.Ed.2d 169. Here, we see little danger of a jury being confused or overwhelmed with facts, considering only two charges were joined for trial. The evidence is largely circumstantial, but at its conclusion a clear picture emerges of two separate instances of the commission of infanticide for financial gain.

Appellant argues the State's case regarding Shaccara's murder is so weak that standing alone, no charges were filed, and thus that charge was joined with the one charging Rod's murder to accomplish, to her undue prejudice, what could not be proved were the charges tried separately. It undoubtedly is true that evidence of the second child's death casts that of the first child in a more culpable light and serves to remove virtually any doubt as to whether the first drowning was accidental. In *People v. Ruiz* (1988), 44 Cal.3d 589, 244 Cal. Rptr. 200, 749 P.2d 854, the defendant's third wife, Tanya, disappeared without a trace in 1975, and when the investigation arising from her family's complaints turned up no evidence of foul play, no charges were brought. However, when the defendant's fifth wife, Pauline, and her son,

Tony, disappeared in 1978, the police investigation led detectives first to notice the missing-persons file report regarding wife No. 3 and then to discover the bodies of wife No. 5 and her son buried in the defendant's back yard. He was charged and convicted in a joint trial of murdering all three missing persons.

When Ruiz appealed the denial of his motion for severance, the California Supreme Court held that:

"[W]ith the discovery of Pauline's and Tony's bodies, the Tanya murder case suddenly became much stronger. But that circumstance is one favoring, rather than disfavoring, joinder of these offenses. The fact that defendant had killed Pauline was quite relevant to the question whether he had killed Tanya; indeed, Pauline's death was relevant to the critical issue whether Tanya too had died of some criminal agency. (See *People v. Archerd* (1970), 3 Cal.3d 615, 621, 638–639, 91 Cal.Rptr. 397, 477 P.2d 421 [evidence of three uncharged murders, including murder of defendant's wife, held admissible at his trial for murdering two other wives].)" 244 Cal.Rptr. at 212, 749 P.2d at 861.

So it is with the case at bar; while undeniably prejudicial, the facts of each drowning comprise germane and relevant evidence *vis a vis* the other; the prejudice thus was not undue. Accordingly, the joinder of charges did not violate due process. In light of the preceding discussion, appellant's Tendered Instruction No. 22 would not have been an accurate statement of the law to be applied here. It is not error to refuse an instruction which states the law incorrectly. *Denton v. State* (1986), Ind., 496 N.E.2d 576. Hence the trial court's refusal of appellant's Instruction No. 22 was not error.

■ Appellant also maintains the joinder impinged her Fifth Amendment right to avoid self-incrimination by denying her the ability to choose to testify as to one charge but not as to the other. However, appellant fails to show what difference separate trials would have made regarding her decision to testify. To demonstrate reversible error, a showing of actual prejudice first must be made and then balanced against the policy favoring joint trials; otherwise, trial courts would be divested of control over severance of charges any time a defendant expressed a desire to testify to one charge while remaining silent as to another. *United States v. Peters* (7th Cir.1986), 791 F.2d 1270. Denial of appellant's motion to sever was not error.

■ Appellant contends the trial court erred in denying her pretrial and presentence motions for funds to hire experts to assist her in preparing her defense and in presenting evidence in mitigation, respectively. Prior to trial, appellant petitioned the court to enable her to hire an expert on severance of charges, competent co-counsel, investigators, a polygraph expert, a consulting psychologist, a jury consultant, a civil engineer, and a sociologist. With the exception of co-counsel, the trial court denied these requests. Upon being found guilty, appellant filed a motion to hire a psychiatrist to aid in identifying mitigating factors, claiming she suffered from emotional disorders; this motion too was denied.

■ Citing federal case law, appellant argues the denial of funds to hire these experts impinged upon her Sixth Amendment rights of effective cross-examination and compulsory process and her Eighth Amendment right to present mitigating evidence in a capital sentencing process. An accused, however, is not constitutionally entitled at public expense to any and all types of experts she desires to support her case; this matter is commended to the sound discretion of the trial court, whose determination will not be overturned absent a showing of abuse of discretion. *Wisehart v. State* (1985), Ind., 484 N.E.2d 949, *cert. denied* (1986), 476 U.S. 1189, 106 S.Ct. 2929, 91 L.Ed.2d 556.

In the case at bar, appellant fails to specify how her case would have benefitted from the use of the requested experts. Whether to sever charges for trial, as discussed in the previous issue, is a mixed question of law and fact, and not one espe-

cially susceptible to illumination beyond that provided by trial court and counsel; defense counsel conducted effective cross-examination at trial; and at the sentencing hearing, the defense did offer the testimony of a psychologist regarding appellant's mental disorders. Absent any specific showing of how she was prejudiced by the denial of her requests for experts, appellant has demonstrated no abuse of discretion. *Id.* We find no error in the refusal to grant appellant's motions for funds to hire experts.

■ Appellant contends the trial court erred in denying her motion for transcripts of all pretrial suppression hearings. She filed a motion to suppress polygraph results on August 19, 1986, and simultaneously requested a hearing thereon. On September 16, 1986, she filed a motion to suppress testimony given before the grand jury and at the CHINS hearing and on that date also moved the court to provide her a complete transcription of all suppression hearings for use at trial. On September 18, 1986, she filed a motion to suppress any mention of life insurance. On September 22, 1986, the court denied the motion for transcript to be used at trial. Jury selection began on September 23, 1986, and the jury was sworn on September 26 and ordered to return on October 6, 1986. Suppression hearings were held between September 29 and October 6, the first day of trial.

Appellant maintains she requested the suppression transcript to be able to present her own evidence to the jury regarding the circumstances of her prior statements and so that her experts could examine the substance of the suppression hearings. She now argues denial of the suppression transcript deprived her of her right to effectively confront witnesses against her and that the trial court's denial of such transcription, *prior to* the suppression hearings, necessarily reveals an absence of any intelligent determination as to whether she needed the transcript to aid in her defense.

Appellant cites cases holding that transcripts of prior mistrials must be available to the defendant during subsequent pro-

ceedings. However, these cases involve essentially the denial to indigent defendants of funds to obtain transcripts; here, the denial was based upon the immediacy of the trial date and the necessity of a relatively lengthy continuance to be able to grant appellant's request. Appellant complains the trial court "chose" to conduct suppression hearings just prior to trial; but this was necessary, obviously, because appellant chose to file suppression motions one week before the trial was scheduled to begin. Moreover, appellant cites no authority requiring a trial court to reschedule proceedings in order to provide an accused with a transcription of pretrial hearings at trial. The State, on the other hand, cites authority approving the denial of a transcript request not made until the jury was about to be impaneled. *See United States v. Hibler* (9th Cir.1972), 463 F.2d 455. The denial of appellant's request for transcripts for trial use of all suppression hearings was not error.

■ Appellant contends the trial court erred in the admission of evidence relating to her polygraph test. She argues such evidence was inadmissible for failure to meet the prerequisites adopted in *Owens v. State* (1978), 176 Ind.App. 1, 373 N.E.2d 913 and approved by this Court in *Pavone v. State* (1980), 273 Ind. 162, 402 N.E.2d 976. These four prerequisites to admitting polygraph test results are: (1) that the prosecutor, the defendant and defense counsel all sign a written stipulation providing for the defendant's submission to the examination and for the subsequent admission at trial of its results; (2) that notwithstanding the stipulation, the admissibility of the test results is at the trial court's discretion regarding the examiner's qualifications and the test conditions; (3) that the opposing party shall have the right to cross-examine the polygraph examiner if his graphs and opinion are offered in evidence; and (4) that the jury be instructed that at most, the examiner's testimony tends only to show whether the defendant was being truthful at the time of the examination, and that it is for the jury to deter-

mine the weight and effect to be given such testimony.

 Appellant maintains the written stipulation signed by her, her counsel, and the prosecutor was defective because it does not include the limitations on admissibility set forth in (2) through (4) above. She also complains that the trial court ruled the polygraph results admissible on October 3, 1986, prior to any hearing on the examiner's qualifications; that the examiner's results were inconclusive as to the test regarding Shaccara's death because only one of three charts was readable; and that the polygrapher's statement at the conclusion of the examination admonishing appellant to tell her attorney the truth was speculative surplusage and at least should have been redacted from the report.

However, there is no requirement that the latter three prerequisites be incorporated into the stipulation outlined in the first one; the latter three were observed at trial and so met the requirements stated in *Owens, supra.* On September 22, 1986, the trial court ruled that the State's motion in limine to admit polygraph results, "there being no objection by the defendant, should be and is now granted." This was a ruling on the State's motion only; appellant's motion to suppress the same evidence was then pending and awaiting hearing, which in fact was held on October 3, 1986, and during which the polygrapher testified as to his training and experience and the conditions under which appellant's examination was conducted. On that same day, the court denied appellant's motion to suppress and again granted the State's motion to admit the polygraph evidence. The trial court thus had sufficient testimonial foundation before it to rule the polygraph results admissible.

 Regarding the alleged inconclusiveness of the examination pertaining to Shaccara's drowning, the polygrapher's report indicates that "[a]fter careful analysis of the polygrams, it is the professional opinion of the examiner that on tests # 1 and # 2 [the unreadable two of three total charts], this subject practiced purposeful non-cooperation [by voluntary controlled

breathing] to beat the polygraph examination." Thus while the first two test/chart's graphs pertaining to particular questions revealed blurred physiological responses, the pattern of such responses indicated active evasiveness to the polygrapher, while as to test/chart # 3 he noted "specific reactions indicative of deception [to certain enumerated] relevant questions." These results presented evidence for the jury's consideration regarding appellant's attempts at deception such that their admission was not an abuse of the trial court's discretion.

 At the conclusion of his report, the polygrapher included his statement to appellant that even though she would not tell him the truth,

> "I want you to make one promise before you leave this room and that is, that you will no longer lie to your attorney regarding these deaths, that you will now tell him the truth so he can provide the best help for you that he can. Will you make me that promise? ... Response from subject: Yes she would tell her attorney the truth now."

Appellant claims this segment of the report constitutes a tacit admission made when her counsel was not present and thus failure to strike it prior to admitting the report in evidence violated her Sixth Amendment right to counsel.

However, this "admission" by appellant, as reported in the examiner's words, is at most cumulative of, and its prejudicial import is minuscule compared to, the test results and expert opinion embodying the remainder of the report. Moreover, appellant had been informed repeatedly of all her rights, including the rights to stop talking and to consult her attorney at any time during the examination. Under these conditions, even a full-fledged confession would not be rendered inadmissible simply because it followed a polygraph examination. *See Carroll v. State* (1982), Ind., 438 N.E.2d 745. We find no reversible error in the trial court's failure to strike this portion of the examiner's report.

Appellant contends the polygraph evidence should not have been admitted because the attorney who represented her during that time rendered ineffective assistance by incompetently advising her to submit to the test and that his performance suffered due to a conflict of interest. The funeral director who handled Rodrigous' arrangements, Mr. Baity, also arranged for Louis McHenry to represent appellant in her attempt to collect the insurance money. McHenry then served as appellant's counsel throughout the CHINS, grand jury, and coroner's inquest proceedings. He discontinued his representation when criminal charges were filed against appellant subsequent to the polygraph examination and defense counsel was appointed by the court.

■ A mere possibility of a conflict of interest is not sufficient to impugn a criminal conviction; a showing that an actual conflict of interest adversely affected counsel's performance is necessary to establish ineffective assistance. *Bieghler v. State* (1985), Ind., 481 N.E.2d 78, *cert. denied*, (1986), 475 U.S. 1031, 106 S.Ct. 1241, 89 L.Ed.2d 349. Even if, as appellant claims, McHenry in fact represented Baity in the latter's attempt to recover funeral expenses out of the insurance proceeds, we fail to see any conflict of interest because, as the State points out, they all shared a common interest in collecting on the policy by appellant's exoneration of any responsibility in Rod's death. Appellant also implies some conflict arose from McHenry's representation of her husband Juan prior to the filing of charges, but she fails to specify, and we fail to see, how her interests were prejudiced thereby.

■ Regarding McHenry's alleged incompetence in allowing appellant to submit to the polygraph test, during the suppression hearing appellant introduced the testimony of attorney Edwin S. Sedwick, who opined that to so advise a client accused of two separate murders would amount to ineffective assistance. However, McHenry spent thirty-five minutes just prior to the examination explaining to appellant the agreement in stipulation of polygraph,

waivers and certification of understanding, and advisement of rights; throughout all the proceedings, appellant maintained her innocence; and in light of the stipulation's provision that the State would not pursue charges if the test results indicated appellant's noninvolvement in the drownings, counsel's failure to dissuade her from undergoing the test clearly represents a sound tactical decision such as not to be condemned "through the distortions of hindsight." *Slaton v. State* (1987), Ind., 510 N.E.2d 1343, 1345. We find no error in the admission of the polygraph evidence.

■ Appellant contends the trial court erred in admitting into evidence the tape recordings and transcripts of her grand jury, CHINS hearing and coroner's inquest testimony, the coroner's verdict, the polygraph examiner's report, and two statements given by appellant to police. At the suppression hearing, she introduced testimony to the effect that she had an intelligence quotient of 86 and a sixth-grade reading comprehension level, while the readability level of a standard advice of rights form is between seventh and tenth grade and that of the agreement in stipulation of polygraph form is at a scientific, professional, or technical level. Reiterating her ineffectiveness of pretrial counsel argument, she maintains her Sixth Amendment right to effective counsel was violated due to a conflict of interest, resulting in her cooperation in the above proceedings which led to the admission of incriminating statements in violation of her Fifth Amendment rights.

Throughout the proceedings, her counsel's advice to cooperate was clearly a matter of strategy. *Id.* Moreover, the record demonstrates that at each of the proceedings listed above, she was informed that her testimony could be used at a subsequent trial and she acknowledged she understood; it thus appears that despite appellant's relatively low reading comprehension ability, with the aid of counsel she was able to comprehend the nature of the pretrial proceedings intelligently enough to waive them freely and voluntarily. *See*

*Thacker v. State* (1985), Ind.App., 477 N.E.2d 921.

■ Citing early Indiana case law, appellant argues it is error *per se* to admit a coroner's verdict to establish cause of death. While appellant's inquest testimony was admitted, the record is devoid of any sign that the coroner's verdict itself was introduced at trial. Appellant's contention in this regard consequently must fail.

■ Shortly after the death of Rodriguous, appellant was requested to come down to the police station to be interviewed. While there, she was advised of her rights, signed a waiver form, and answered questions in a manner consistent with her stance of noninvolvement. She returned to the station four days later to answer additional questions and the same procedures were observed. Because appellant was not in custody and had not yet been charged, her right to counsel had not yet attached and *Miranda* requirements did not apply. *Whitehead v. State* (1987), Ind., 511 N.E.2d 284. We note in addition that these two statements did not constitute a confession, nor has appellant specified in what manner she was inculpated by those statements.

The record in this case demonstrates that the trial court did not commit error by finding appellant had knowingly and voluntarily waived her Fifth Amendment rights regarding her pretrial statements.

■ Appellant contends the trial court erred in allowing the State to introduce testimony and exhibits containing references to the paternity of her children. She filed a motion in limine to exclude any such references on the ground they would serve only "to inflame the jurors' minds due to the fact that the Defendant had had several children." The trial court granted the motion. However, at trial, the court overruled appellant's objections to the admission of references to the victims' paternity, stating "[m]ost certainly the heart or the big part of this case is to identify the fathers. My interpretation of the Motion in Limine relating to paternity was that you not make a federal case out of that, out of that aspect." At the close of the

State's case, appellant moved for mistrial based on the admission of evidence relating to paternity; the motion was denied.

■ Reversal due to denial of a motion for mistrial requires a showing that appellant thereby was placed in a position of grave peril to which she should not have been subjected. *Bradford v. State* (1983), Ind., 453 N.E.2d 250. Noting that most of the paternity evidence arose in the context of her A.F.D.C. applications, appellant argues it was introduced solely to prejudice the jury by means of an implication that she had committed some type of welfare fraud or other wrongdoing, and that because these issues are collateral they are inadmissible.

■ Evidence is relevant, thus admissible, if it tends to prove or disprove a material fact or sheds any light on the guilt or innocence of the accused. *Cox v. State* (1985), Ind., 475 N.E.2d 664. As we noted above, inculpatory evidence is unduly prejudicial only insofar as it is irrelevant. *See Ruiz, supra.* The State contended at trial, and we now agree, that appellant's representations as to the paternity of her children, namely, that she claimed variously that she was married to their father, Antonio Felicciones, that she had never married him, and later that her husband Juan instead was the father of her second child, Rod, were relevant to explain her hostility toward and rejection of her children.

Appellant's attitudes regarding the paternity of her children clearly are relevant to her state of mind and her potential motives in committing the crimes charged. The trial court did not err in allowing in evidence the testimony as to paternity.

■ Appellant contends the trial court erred during the testimony of various witnesses by admitting over her objection certain documentary evidence, narratives and reports. During the testimony of State's witnesses Sharon Bates and Randy Emly, both of whom were welfare department caseworkers, a narrative of appellant's interview with Bates was introduced (and later withdrawn) and copies of her A.F.D.C. applications were admitted. Appellant

complains that because her applications contained some misrepresentations of fact, they were introduced merely to prejudice the jury against her with evidence of prior uncharged wrongdoing in contravention of the prohibition against the use of prior crimes to show a tendency to commit the crime charged, citing *Paulson v. State* (1979), 181 Ind.App. 559, 393 N.E.2d 211.

 However, as she acknowledges, such evidence may be admissible if it proves a fact in issue and if its probative value outweighs its prejudicial effect. *Feyerchak v. State* (1978), 270 Ind. 153, 383 N.E.2d 1027. Moreover, evidence of other criminal activity, though generally inadmissible on the question of guilt, may be admissible to show intent, motive, purpose, identification, or common scheme or plan. *Smith v. State* (1986), Ind., 490 N.E.2d 748. In the case at bar, the jury was specifically instructed that any evidence of prior crimes was to be used only for the purpose of showing motive, purpose or common scheme or plan. As alluded to in our discussion of the previous issue, the jury was entitled to infer a financial motive in appellant's bearing, treatment, and disposition of her children; that is, her attempts, legitimate or otherwise, to secure A.F.D.C. benefits thus were relevant here because of a common scheme to secure a livelihood, out of which scheme, one might infer, devolved her motive to commit the crimes charged.

 After the transcript of appellant's testimony at the CHINS hearing was admitted during the testimony of State's witness Wanda Connor, the witness summarized what occurred at the hearing and during an interview with appellant conducted two days after Shaccara's death. Detective George Kramer testified as to what appellant told him at the same interview, and his report in that regard was admitted as State's Exhibit 33. After the testimony of Dr. Schroeter, the emergency room physician who tried to resuscitate and then examined Rodrigues, the witness' medical report was admitted as State's Exhibit 42. Appellant claims the summary of the CHINS hearing, the police report, and the medical report should not have been admit-

ted because they were cumulative, used only to bolster the State's case, and were not needed to refresh the witnesses' memories. However, evidence which is relevant to illustrate the witness' testimony is admissible even though it is cumulative; the admission of cumulative evidence is within the discretion of the trial court, and absent abuse of that discretion, we will not reverse. *Davis v. State* (1983), Ind., 456 N.E.2d 405. Here, appellant fails to demonstrate how she was unduly prejudiced so as to amount to an abuse of discretion; we thus find no error.

 She also argues that police reports have been held to be generally inadmissible because statements taken by the reporting officer are not given in the usual course of the eyewitness' business and thus do not fall within the business records exception to the hearsay rule, citing *Wells v. State* (1970), 254 Ind. 608, 261 N.E.2d 865. In *Wells*, however, admission of the report was found not to constitute reversible error because it contained no hearsay prejudicial to the appellant. In the instant case, the report contains only information related to Detective Kramer by appellant; because appellant elected not to testify at trial, her out-of-court statements were hearsay. *Washburn v. State* (1986), Ind., 499 N.E.2d 264. Nevertheless, had her statements in fact been inculpatory, they would have been admissible as admissions against interest. *Id.* At any rate, she fails to specify how she was prejudiced by the report's admission; thus no reversible error has been shown. *Bradford, supra.* Moreover, the substance of the detective's report was introduced by means of his oral testimony to which appellant did not object. Even the erroneous admission of evidence is not reversible when evidence of the same probative value is admitted without objection. *Fozzard v. State* (1988), Ind., 518 N.E.2d 789.

We find no reversible error in the admission of the narratives and reports complained of here.

 Appellant contends the trial court erred in admitting the State's evidence of motive. Appellant filed a motion in limine

to prohibit any mention of life insurance or motive; at trial, she objected to the admission of State's Exhibits Nos. 37 and 38, the applications for life insurance on her children. Her attempts to exclude the evidence were denied. She argues that because motive is not an element of homicide, the State must meet its burden of proving intent, in even a circumstantial case, without the use of motive, citing *German v. State* (1975), 166 Ind.App. 370, 337 N.E.2d 883. She also cites other Indiana cases for the proposition that motive is not an element of proof required for a conviction of homicide.

While appellant's latter proposition is a correct statement of the law, she has mischaracterized the holding in *German*, where the Court of Appeals found the circumstantial evidence in that case insufficient, *in the absence of any evidence of motive*, to support German's conviction. That decision went on to note that an inference of intent may properly be based upon the existence of a motive. This Court held, in *Chinn v. State* (1987), Ind., 511 N.E.2d 1000, 1004, that "[e]vidence of life insurance benefits is relevant to show a defendant's motive in a homicide case." Clearly, precedent supports the use of motive in circumstantially establishing the element of intent.

Appellant also advances argument to the effect that the admission of evidence of a murder-for-monetary-gain motive allowed the jury to convict upon a lesser standard of proof than beyond a reasonable doubt, and that it "tainted" the jury to the extent they "could no longer hear mitigating evidence with an open mind" regarding a death penalty recommendation. In light of our holding the evidence of motive to be relevant and properly admitted, and in view of no death penalty recommendation returned by the jury, we find these assertions by appellant to be without merit and moot, respectively.

The evidence of appellant's financial motive for committing infanticide was relevant to circumstantial proof of her intent and was properly admitted.

■ Appellant contends the trial court erred in allowing appellant's husband Juan to testify over her assertion of the husband-wife privilege. Juan testified as a hostile witness for the State. When he was asked whether he had ever seen or been told by appellant of her method of disciplining Rodrigous by holding him up-side-down and smacking his bottom with a wet shoe, appellant objected, claiming any such communication, whether by word or act, would be subject to spousal privilege as per Ind.Code § 34–1–14–5. The objection was overruled, and Juan responded in the negative.

Appellant acknowledges the child abuse reporting requirement abrogation of the spousal and medical provider privileges found at Ind.Code § 31–6–11–8, since amended. At the time of Rod's death, the section read in pertinent part:

"The privileged quality of communication between a husband and wife ... is not a ground for: (1) excluding evidence in any judicial proceeding resulting from a report of a child who may be a victim of child abuse or neglect, or relating to the subject matter of such a report...."

Appellant maintains the exception should not apply in the case at bar because it does not specify "murder" along with child abuse and neglect. In support, she recites case law holding that penal statutes, being in derogation of the common law, must be strictly construed and not extended beyond their letter. *Wilson v. Montgomery Ward & Co., Inc.* (N.D.Ind.1985), 610 F.Supp. 1035; *Gore v. State* (1983), Ind.App., 456 N.E.2d 1030.

However, the wording "in any judicial proceeding ... relating to the subject matter of such a report" of child abuse or neglect by its terms would seem to encompass murder charges arising from child abuse; indeed, we have held this section applicable in the case of child molesting, which offense likewise is not specified in the abrogation section. *Baggett v. State* (1987), Ind., 514 N.E.2d 1244. Here, where the abrogation section, even under appellant's interpretation, clearly would apply had no deaths resulted and the child

abuse/neglect been charged merely as such, it would fly in the face of the statute's purpose of protecting children to uphold the spousal privilege simply because the children died.

We further note that Juan responded that he had no such knowledge of appellant's abusive treatment of Rod, while another witness, Linda Jones, testified appellant had told her of this method of disciplining her baby. This information, had it been communicated to Juan, thus would not have been privileged because it was not intended by appellant to be confidential, as demonstrated by its communication to Linda Jones. *See Perkins v. State* (1985), Ind., 483 N.E.2d 1379.

The trial court's refusal to apply the spousal privilege to Juan's testimony was not error.

Appellant contends the trial court erred in the process of rendering sentence. On November 12, 1986, after the jury returned no recommendation regarding the death penalty, the trial court set appellant's sentencing date for December 2, 1986. On November 21, 1986, appellant filed a "Motion for Continuance and Psychological Evaluation" to prepare mitigating evidence regarding a potential death sentence. The day prior to sentencing, the State filed a nine-page sentencing recommendation based upon the factors enumerated in the felony sentencing statute, Ind.Code § 35–38–1–7. On the day of the hearing, appellant renewed her motion, based in part upon a need to respond to the State's recommendation. The trial court denied appellant's motion, and after finding a death sentence inappropriate, proceeded to sentence appellant to the maximum consecutive terms of years, reciting aggravating and mitigating circumstances as listed under § 35–38–1–7.

■ Appellant argues the denial of a continuance denied her the opportunity to present evidence in mitigation as required by Ind.Code § 35–38–1–3. She maintains essentially that she was prepared at sentencing to argue only the death penalty mitigators as set out in Ind.Code § 35–50–2–9 and was surprised by the State's inclusion in its recommendation, and the trial court's use, of the substantially different factors listed in § 35–38–1–7, the felony sentencing considerations.

Upon appellant's objection, the State withdrew the portion of its recommendation dealing with the felony sentencing considerations; and prior to rendering sentence, the court gave appellant the opportunity to present any evidence or argument she might have in mitigation. Appellant responded by moving to incorporate the evidence presented before the jury at the penalty phase, which motion was granted.

We find it hard to imagine that appellant held back, at the death penalty phase before the jury, any possible evidence in mitigation which might be used subsequently to reduce a term of years. Moreover, appellant fails to specify what evidence she might have introduced had her continuance been granted. Absent a showing of prejudice, we find no abuse of the trial court's discretion in denying the instant motion for continuance. *Rhinehardt v. State* (1985), Ind., 477 N.E.2d 89.

■ Appellant argues the trial court considered improper factors in aggravation in order to enhance her two murder sentences to the maximum sixty (60) years each to be served consecutively. She maintains it was improper for the court to find as aggravating circumstances that she was "incorrigible" and had been away from home without permission, that she had given birth to two children by · the age of eighteen, and that she failed to show remorse such that her steadfast denial of responsibility for the deaths resulted in perjury charges pending against her at the time of sentencing.

Appellant characterizes the court's use of these circumstances as constituting the improper use in aggravation of uncharged crimes and of her failure to admit guilt, which have been held to be improper reasons for enhancing sentence in, respectively, *Anderson v. State* (1983), Ind., 448 N.E.2d 1180 and *Guenther v. State* (1986), Ind.App., 495 N.E.2d 788. However, appellant fails to note the decision in *Guenther*

subsequently was vacated by this Court, holding that lack of remorse is a proper consideration where it reveals a likelihood the crime would be repeated. *Guenther v. State* (1986), Ind., 501 N.E.2d 1071. Similarly, viewed properly in context, the trial court's mention of the circumstances here at issue was by way of concluding that to prevent recurrence of her offenses, appellant required long-term rehabilitative treatment best provided by a penal institution. *See also Stewart v. State* (1988), Ind., 531 N.E.2d 1146.

■ Moreover, enhancement of presumptive sentences, along with imposition of consecutive sentences, may be supported by a single aggravating circumstance. *Id.; Anderson, supra.* Here, the trial court found, in addition to the circumstances mentioned above, that there were two murders, that the victims were of tender age and dependent upon their mother, the perpetrator, and that imposition of a lesser sentence would depreciate the seriousness of the crimes. In light of all the factors enunciated by the trial court, we do not find the sentence here to be manifestly unreasonable.

■ Finally, appellant maintains the trial court erred in assessing costs of $71 despite finding her indigent. In support, she cites *Meeker v. State* (1979), 182 Ind. App. 292, 395 N.E.2d 301.

While the State here confesses error and concedes this case should be remanded for a hearing on indigency, we take judicial notice that to order such an undertaking on the possibility of recovering $71 in costs from appellant would constitute an inefficient use of judicial and other resources. In *Marshall v. State* (1987), Ind.App., 505 N.E.2d 853, the Court of Appeals resolved a parallel situation by holding that although a fine could not be enforced against an allegedly indigent appellant absent a hearing to determine indigency, where no attempt was being made to collect the fine, there existed no appealable issue. We thus reach the same conclusion regarding the instant assessment of $71.00 in costs.

We find no reversible error in appellant's sentencing.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, PIVARNIK and DICKSON, JJ., concur.